# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

EDWIN MEJIA, individually, and on behalf of other members of the general public similarly situated,

                        Plaintiff,

        v.

COPART, INC., a Delaware corporation; COPART CATASTROPHE RESPONSE FLEET LLC, a Delaware limited liability company; COPART-DALLAS, LLC, a California limited liability company; COPART-HOUSTON, LLC, a California limited liability company; and DOES 1 through 10, inclusive,

                        Defendants.

Case No. 2:24-cv-01705-SPG-JC

**ORDER GRANTING, IN PART, AND DENYING, IN PART, PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION AND PAGA SETTLEMENT [ECF NO. 32]**

    Before the Court is the Motion for Preliminary Approval of Class Action and PAGA Settlement (ECF No. 32 ("Motion")) filed by Plaintiff Edwin Mejia ("Plaintiff"). The Court has read and considered the Motion and concluded that it is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS in part, and DENIES, in part, the Motion.

I.    **BACKGROUND**

A.    **Plaintiff's Allegations**

This is a putative wage-and-hour class action lawsuit brought by Plaintiff against Defendants Copart, Inc., Copart Catastrophe Response Fleet LLC, Copart-Dallas, LLC, and Copart-Houston, LLC ("Defendants"). (ECF No. 22 ("FAC")). Defendants are providers of online vehicle auction services, specializing in the resale of used, wholesale, and salvage title vehicles. (*Id.* ¶ 21). Plaintiff was an employee of Defendants from January 2006 to August 2023, working as a forklift driver at Defendants' facility in Van Nuys, California. (*Id.* ¶ 5).

Plaintiff seeks to represent a California class of Defendants' non-exempt, hourly paid employees. (*Id.* ¶ 52). Plaintiff alleges that Defendants violated California laws on overtime, minimum wage, meal and rest periods, maintenance of payroll records, timely payment of wages on termination and during employment, and payment of business expenses. Plaintiff asserts claims for various violations of the California Labor Code, as well as claims under California's Unfair Competition Law ("UCL") and Private Attorneys General Act ("PAGA").

Plaintiff initially filed the class-action complaint in Los Angeles County Superior Court on January 29, 2024. (ECF No. 1-1). Defendants removed the case to this Court on March 1, 2024. (ECF No. 1). On August 20, 2024, Plaintiff filed the FAC, adding the PAGA claim. (FAC). On November 27, 2024, before Defendants had filed any responsive pleading to the FAC, the parties filed a joint notice of settlement. (ECF No. 26). In the notice of settlement, the parties requested that the Court set a status conference related to the filing of a motion for preliminary approval, which the Court set for March 26, 2025. (ECF No. 27).

Plaintiff filed the instant Motion on May 2, 2025. (Mot.). The Motion is accompanied by a declaration from Plaintiff's Counsel and copies of the parties' Settlement Agreement and proposed Class Notice. (ECF No. 32-1). In the Motion, Plaintiff requests that the Court preliminarily approve the settlement, conditionally certify the proposed

settlement class, appoint Plaintiff as class representative, appoint Capstone Law APC as class counsel, appoint CPT Group, Inc. as the settlement administrator, approve distribution of the proposed Class Notice, and set a hearing date for final approval of the settlement. (Mot. at 2).

**B.     The Settlement Agreement**

On August 28, 2024, the parties participated in private mediation with Daniel Turner. (*Id.* at 12); (ECF No. 32-1 at 2). The parties notified the Court of their intent to settle on November 27, 2024, and, following a brief stay, ultimately signed the Joint Stipulation of Class Action and PAGA Settlement and Release ("Settlement Agreement") on May 2, 2025. (ECF No. 32-1 at 40-41). Plaintiff's Counsel represents that the Settlement Agreement was negotiated at arms-length in adversarial proceedings between counsel. (*Id.* at 2); (Mot. at 12). The Settlement Agreement provides the following key provisions.

1.     <u>Class Definition</u>

The Settlement Agreement defines the Class to be "all persons who worked for Defendants as non-exempt, hourly paid employees in California at any time during the Class Period." (ECF No. 32-1 at 13). The Class Period is defined as "the period from January 29, 2020 to November 28, 2024." (*Id.*). As used in the Settlement Agreement, the term "Defendants" includes all the named Defendants in this action. (*Id.*). Based on Defendants' records, Plaintiff estimates the Class to include approximately 1,500 members. (Mot. at 13).

The Settlement Agreement also defines a group of "PAGA Members" consisting of "all persons who worked for Defendants as non-exempt, hourly paid employees in California at any time during . . . the period from February 27, 2023 through November 28, 2024." (ECF No. 32-1 at 15). Plaintiff estimates that there are approximately 900 PAGA Members. (Mot. at 13).

### 2. Settlement Amount

The gross settlement amount agreed upon by the parties is $1,270,000. (ECF No. 32-1 at 18).    The Settlement Agreement allocates $100,000 of the gross settlement for settlement of claims for civil penalties under PAGA, 25% of which is allocated to the PAGA Members, and 75% of which is to be paid to the California Labor and Workforce Development Agency ("LWDA"). (*Id.* at 20). The Settlement Agreement also allocates up to $15,000 for an Administrator Expenses Payment. (*Id.*). Additionally, Plaintiff seeks a class representative award of $5,000 and a "general release payment" of $10,000 for the release of all claims arising out of his employment with Defendants. (*Id.* at 19). Finally, after taking into account attorney's fees and costs, participating class members will be paid a pro rata share of the remaining settlement, calculated according to the number of weeks worked during the Class Period. (*Id.* at 21). Plaintiff estimates that this will result in an average net recovery of approximately $467 per Class Member and a net recovery of approximately $28 per PAGA Member. (Mot. at 13-14).

### 3. Attorney's Fees and Costs

The putative class seeks to be represented by attorneys Robert J. Drexler, Jr., Jonathan Lee, Melissa Grant, and Raul Perez of Capstone Law APC.[1] The Settlement Agreement provides that class counsel will seek attorney's fees of not more than $423,333, plus litigation costs not to exceed $15,000, and that Defendants will not oppose a motion for these costs. (ECF No. 32-1 at 18). Any amount not ultimately awarded by the Court will become part of the net settlement fund and be available for distribution to the Class Members. (*Id.* at 19).

---

[1] The first three of these attorneys have appeared in this case, but Raul Perez, who filed the affidavit in support of the Motion and signed the instant Motion, has not appeared in the case. Additionally, the instant Motion is not signed by Melissa Grant. Prior to participating in the filing of any further motions in this case, Raul Perez should make an appearance on the docket.

4.   <u>Release of Persons and Claims</u>

The Settlement Agreement operates to release from claims certain "Released Parties," defined to mean "Defendants, their past or present officers, directors, shareholders, agents, principals, heirs, representatives, accountants, auditors, consultants, insurers and reinsurers, and their respective successors and predecessors in interest, subsidiaries, affiliates, parents and attorneys, if any." (*Id.* at 16).

Under the Settlement Agreement, the Class Representative Plaintiff will release the Released Parties from "all claims arising out of his employment with Defendants." (*Id.* at 19). In exchange for this general release, Defendants agree not to oppose or impede his application for a General Release Payment of up to $10,000, paid from the gross settlement amount. (*Id.*).

Next, all Class Members who do not opt out of the Settlement Agreement will release the Released Parties from (1) the claims alleged in the lawsuit as set forth in the FAC; (2) any claims for injunctive relief, declaratory relief, or restitution that were alleged or could have been alleged under the facts, allegations, or claims pleaded in the complaints; and (3) any and all other claims under California or federal law that could have been alleged under the same or similar facts, allegations, or claims pleaded in the complaints and based on the alleged Labor Code violations. (*Id.* at 26-27).

Finally, all PAGA Members will release the Released Parties from any and all claims for PAGA violations "as alleged in the Operative Complaint, which includes those alleged in the PAGA Notice sent to the LWDA by Plaintiff that arose at any time during the PAGA Period." (*Id.* at 27). PAGA Members will not have the opportunity to opt out of, or object to, the PAGA Member Payment and will be bound by the release regardless of their participation in the Class. (*Id.* at 28).

## II.   LEGAL STANDARD

Parties seeking class certification for settlement purposes must satisfy the requirements of Federal Rule of Civil Procedure 23. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). In considering such a request, the court must give the Rule 23

certification factors "undiluted, even heightened, attention in the settlement context." *Id*. Once a class is certified, Rule 23(e) provides that "[t]he claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). Accordingly, before approving a class action settlement under Rule 23, a district court must conclude that the settlement is "fundamentally fair, adequate, and reasonable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). In the Ninth Circuit, there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (citation omitted).

Court approval of a class action settlement requires a two-step process—a preliminary approval followed by a later final approval. *See Tijero v. Aaron Bros., Inc.*, No. C 10–01089 SBA, 2013 WL 60464, at *6 (N.D. Cal. Jan. 2, 2013) ("The decision of whether to approve a proposed class action settlement entails a two-step process."); *West v. Circle K Stores, Inc.*, No. CIV. S-04-0438 WBS GGH, 2006 WL 1652598, at *2 (E.D. Cal. June 13, 2006) ("[A]pproval of a class action settlement takes place in two stages."). At the preliminary approval stage, the court "must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms." *Woodard v. Labrada*, No. EDCV 16-00189 JGB (SPx), 2019 WL 4509301, at *3 (C.D. Cal. Apr. 23, 2019) (quoting Manual for Complex Litigation (Fourth) § 21.632 (2012)). However, the "settlement need only be *potentially* fair, as the Court will make a final determination of its adequacy at the hearing on Final Approval." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 386 (C.D. Cal. 2007) (emphasis in original).

## III. DISCUSSION

### A. Rule 23(a)

Plaintiff first seeks conditional certification of the settlement class pursuant to Rule 23(a). For the reasons discussed below, the Court finds that Rule 23's requirements of

numerosity, commonality, typicality, and adequacy of representation are all satisfied for purposes of preliminary certification. *See* Fed. R. Civ. P. 23(a)(1)-(4).

### 1. Numerosity

A class satisfies the prerequisite of numerosity if it is so large that joinder of all class members is impracticable. *Hanlon*, 150 F.3d at 1019. To be impracticable, joinder must be difficult or inconvenient, but need not be impossible. *Keegan v. Am. Honda Motor Co.*, 284 F.R.D. 504, 522 (C.D. Cal. 2012). "The numerosity requirement is not tied to any fixed numerical threshold," but "[i]n general, courts find the numerosity requirement satisfied when a class includes at least 40 members." *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010) (citing cases). Here, Plaintiff estimates that there are approximately 1,500 Class Members. (Mot. at 13). Because joinder of such a large number of plaintiffs would be impracticable, numerosity is satisfied.

### 2. Commonality

Putative class claims meet the commonality requirement when they "depend upon a common contention . . . capable of classwide resolution—which means that a determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (internal quotation marks and citation omitted). Thus, where the circumstances of class members "vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Id.* (citation omitted).

"In the wage and hour context, the inquiry is whether the entire class was injured by the same allegedly unlawful wage and hour practice." *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 604 (E.D. Cal. 2015). That is precisely the case here. As alleged in the FAC, all Class Members here were employed by Defendants during the Class Period and faced common wage-and-hour violations by Defendants that arose out of Defendants' alleged policies and practices. (FAC ¶¶ 21-22, 61). In the Motion, Plaintiff argues that

each of his "theories of liability presents common legal and factual questions that predominate over any individual issues." (Mot. at 16).  For example, on the meal and rest period claims, Plaintiff argues that Defendants "had a company-wide policy and/or practice of understaffing their locations, which led to a failure to provide Class Members with" the required breaks.  (*Id.* at 16, 18).  On the other claims, Plaintiff points to "common practice[s]" applied to all employees involving scheduling, expense reimbursements, and wage statements.  (*Id.* at 19-21).  Because the claims arise out of and relate to Defendants' uniform policies and practices, the Court finds that there are common questions sufficient to meet the commonality requirement of Rule 23(a)(2).

### 3.    Typicality

Rule 23(a)(3) requires that the claims or defenses of the class representatives be typical of the claims or defenses of the class they seek to represent.  Fed. R. Civ. P. 23(a)(3).  The purpose of the typicality requirement is to "ensure[] that the interest of the class representative aligns with the interests of the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (internal quotation marks and citation omitted).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted).  Representative claims are "typical" if they are "reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.  Courts have held that typicality and commonality requirements "tend to merge," *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982), and a finding of commonality ordinarily will support a finding of typicality, *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 644 (N.D. Cal. 1987).

The Court finds that Plaintiff's claims are typical of the class because they arise out of the alleged wage-and-hour violations by Defendants.  The putative class is comprised of other employees who allege identical harms resulting from Defendants' various employment policies and practices.  *See* (FAC ¶ 61; Mot. at 16-22).  Thus, Plaintiff's

claims are identical to those of the putative class, are based on the same alleged course of conduct, and involve the same injuries as those of the putative class.

### 4.    Adequacy of Representation

Finally, Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them." *Hanlon*, 150 F.3d at 1020. To determine whether the adequacy prong is satisfied, courts consider the following two questions: "(1) [d]o the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003); *see also Fendler v. Westgate-California Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975) (noting that representative plaintiffs and counsel must have sufficient "zeal and competence" to protect class interests).

Plaintiff's Counsel represents that proposed Class Counsel has "successfully certified numerous class actions by way of contested motion in state and federal court, and have negotiated settlement totaling over 200 million dollars on behalf of hundreds of thousands of Class Members." (Mot. at 22-23). Plaintiff also provided professional biographies of the attorneys in this case, attesting to their experience in litigating similar cases. (ECF No. 32-1 at 52-57). As to the named Plaintiff, the Motion represents that "Plaintiff has and will represent putative Class Members with a focus and zeal true to the fiduciary obligation that he has undertaken." (Mot. at 22). The parties have not identified any conflicts of interest with other class members, and the Court is otherwise unaware of any such conflicts. On this record, the Court agrees that the proposed class representatives and counsel will fairly and adequately protect the interests of the class.

With all four requirements satisfied, the Court finds at this time that the Settlement Class satisfies Rule 23(a) for the purposes of preliminary approval of the class action settlement.

**B.    Rule 23(b)**

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem*, 521 U.S. at 614.  Plaintiff seeks to certify the proposed class under Rule 23(b)(3). (Mot. at 15).  Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

1.    Predominance

"The Rule 23(b)(3) predominance inquiry asks the court to make a global determination of whether common questions prevail over individualized ones." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016).  "[A]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof."  *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)) (internal quotation marks and alterations omitted).

As discussed above, all putative class members' claims relate to the same alleged wage-and-hour violations or are derivative of those alleged violations.  The underlying claims are based on Defendants' "company-wide policies, including timekeeping policies and meal and rest period policies," which "set forth uniform policies and procedures" common to all employees.  (FAC ¶¶ 21-22).  Specifically, Plaintiff identifies a company-wide practice of systemic understaffing, which regularly forces employees to miss meal and rest periods.  (Mot. at 16-18).  Plaintiff also points to a common policy of requiring employees to use their personal cellphones and purchase their own protective equipment. (*Id.* at 20-21).  Finally, Plaintiff points out that Defendants used standardized wage statements common to all employees.  (*Id.* at 21-22).  Courts in this district have held that "[w]hen the claim is that an employer's policy and practices violated labor law, the key

question for class certification is whether there is a consistent employer practice that could be a basis for consistent liability." *Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 399 (C.D. Cal. 2008). Given that the only claims here are based in allegations of a common policy or practice applied to all Class Members, Plaintiff has shown that common questions of law or fact predominate over individual questions. *See id.* at 403 (concluding common questions predominated where the defendant "admits that it had company-wide policies and procedures regarding compensation for meetings that were consistently applied"); *Millan*, 310 F.R.D. at 606 (concluding that predominance requirement was met where "[t]he primary injuries to the class members appear to be largely identical and are all alleged to be the result of an overarching policy").

While it is true that the calculation and distribution of class shares may require the resolution of some individualized questions, "[i]n this circuit . . . damage calculations alone cannot defeat certification." *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010). Because "damages determinations are individual in nearly all wage-and-hour class actions," the need to individually calculate "the amount of damages . . . does not defeat class action treatment." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (citation and alterations omitted). Thus, the Ninth Circuit has approved class certification where "the damages for individual class members will entail a straightforward calculation of which days and how many hours they would have worked." *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001). Consistent with these cases, the Court concludes that the fact that there may be some individual determinations needed to distribute the settlement here does not defeat class certification. *See Millan*, 310 F.R.D. at 606 (concluding common questions predominated even though "the scope of the underpayment will vary from plaintiff to plaintiff").

### 2. Superiority

Additionally, the Court must find that a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b). "Where classwide litigation of common issues will

reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.* 97 F.3d 1227, 1234 (9th Cir. 1996). The Rule lists four non-exclusive factors "pertinent" to the inquiry: (A) the interest of class members in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of other litigation concerning the controversy; (C) the desirability of concentrating litigation in the particular forum; and (D) the likely difficulties in managing the class action. Fed. R. Civ. P. 23(b)(3). However, for settlement-only classes, "a district court need not inquire whether the case, if tried, would present intractable management problems." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019) (quoting *Amchem*, 521 U.S. at 620).

Surveying these factors, a class action appears to be the superior method of adjudicating Plaintiff's claims. As discussed, the claims rest on common allegations of Defendants' alleged policies and practices, such that the litigation will depend on the resolution of common questions. Given the large size of the class, adjudicating these common questions through a class action is likely to "reduce litigation costs and promote greater efficiency." *Valentino*, 97 F.3d at 1234; *see also Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 624 (C.D. Cal. 2015) (approving class action where individualization "would result in thousands of trials re-litigating the same legal and factual questions"). Moreover, the potential individual recovery of approximately $467 is so small as to make "class certification . . . the only feasible means for [the class members] to adjudicate their claims." *Leyva*, 716 F.3d at 515. As a result, other Class Members would appear to have little interest in individually controlling the litigation. *Millan*, 310 F.R.D. at 606 (concluding that "[i]t is unlikely that" an average recovery of $7,386 "would drive interest in controlling the prosecution of a separate action"). The Court is also unaware of any other pending litigation related to this controversy. Finally, to the extent that the forum location is relevant in the class settlement context, *see Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 477 (E.D. Cal. 2010) (questioning whether this factor applies to settlement-only class approval), the Court sees no reason that concentration in this forum

would be undesirable, given that the putative class is made up of Defendants' California employees. Accordingly, the Court preliminarily concludes that a class action would be the superior vehicle for adjudication of these claims. The requirements of Rule 23(b) are therefore met.

**C.    Rule 23(e)**

Finally, at the preliminary approval stage, the parties must show that "the court will likely be able to . . . approve the proposal under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(1)(B). Following amendments in 2018, Rule 23(e)(2) requires courts to determine whether the proposed settlement is "fair, reasonable, and adequate" based on consideration of whether:

> (A)    the class representatives and class counsel have adequately represented the class;
> (B)    the proposal was negotiated at arm's length;
> (C)    the relief provided for the class is adequate, taking into account:
>> (i)    the costs, risks, and delay of trial and appeal;
>> (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii)  the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv)   any agreement required to be identified under Rule 23(e)(3); and
> (D)    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Before the 2018 revisions to Rule 23(e), the Ninth Circuit had developed its own list of eight factors to be considered in assessing the fairness and adequacy of a proposed settlement. *See Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). The Ninth Circuit has not directly spoken to how the 2018 amendments fit with this list of factors, though as one court has noted, the prior factors "correlate with the new language

of the rule." *Gagnier v. Siteone Landscape Supply LLC*, No. SACV 21-01834-CJC (DFMx), 2023 WL 8116831, at *6 (C.D. Cal. June 6, 2023). The revised Rule 23(e) "directs the parties to present [their] settlement to the court in terms of [this new] shorter list of core concerns," and explains that the goal of the amendment was "to focus the [district] court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes. Accordingly, the Court will examine the fairness of the proposed settlement agreement in light of the amended 23(e) factors, but will consider the pre-2018 factors "to the extent that they shed light on the inquiry mandated by the amended Rule 23(e)." *Gagnier*, 2023 WL 8116831, at *6.

### 1.    Adequacy of Representation by Class Representatives and Class Counsel

The first factor requires that the class representatives and class counsel have adequately represented the class. Fed. R. Civ. P. 23(e)(2)(A). As the Court concluded with respect to the adequacy analysis under Rule 23(a), Plaintiff's Counsel appears to have extensive experience in litigating these types of cases. Specific to this case, based on the Court's review of the complaints and the Settlement Agreement, Plaintiff's Counsel's work appears to have been adequate. While the Court notes the lack of any significant motion practice or discovery in this case, Plaintiff has detailed the "thorough investigation" that it undertook, including review of documents and data produced by Defendants. (ECF No. 32-1 at 3-4). As to Plaintiff's Counsel, the Court finds that the representation has been adequate.

The Court has less information about the work performed by Plaintiff in this case. The Motion describes Plaintiff's "focus and zeal" but fails to offer any specific information about Plaintiff's participation. (Mot. at 22). However, the Court notes that Plaintiff's interests appear to be substantially aligned with those of the other putative class members in that they are all employees of Defendants who were harmed due to Defendants' alleged employment policies and practices. Given Plaintiff's Counsel's bare attestation, in the

absence of any evidence of inadequacy, the Court finds for purposes of preliminary approval that Plaintiff's representation has been adequate.  For any renewed motion, however, Plaintiff should provide more specific information to support a finding of adequacy as to the class representative.

### 2.    Arm's Length Negotiation

The second factor requires that the proposed settlement has been negotiated at "arm's length."  Fed. R. Civ. P. 23(e)(2)(B).  Plaintiff asserts that the settlement negotiations were "at arm's length," (Mot. at 11), and the Settlement Agreement itself recounts that the parties "arrived at this Settlement after arm's-length negotiations and in the context of adversarial litigation," (ECF No. 32-1 at 36).  Moreover, the negotiations occurred before a neutral private mediator.  *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 937, 948 (9th Cir. 2011) (explaining that while the "mere presence of a neutral mediator . . . is not on its own dispositive," it is "a factor weighing in favor of a finding of non-collusiveness").  Thus, there is no apparent unfairness "on the face of the negotiations." *Id.*

However, the Ninth Circuit has warned that, in assessing class action settlements, "[c]ollusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947.  Some such "subtle signs" of collusion include (1) when the agreement awards counsel a disproportionate share of the settlement; (2) when the parties agree to a "clear sailing" arrangement through which the defendants do not object to fee requests by class counsel; and (3) when the agreement reverts unclaimed funds to the defendant rather than to the class fund. *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 (9th Cir. 2019).

The Settlement Agreement does contain some of these "subtle signs" of collusion.  As discussed in greater detail below, the provision for attorney's fees is unusually high, in excess of the 25% benchmark that courts in the Ninth Circuit generally find reasonable.

*See Hanlon*, 150 F.3d at 1029 ("This circuit has established 25% of the common fund as a benchmark award for attorney fees.").  Moreover, the Settlement Agreement contains a "clear sailing" agreement under which Defendants "agree not to oppose or impede any application or motion for attorneys' fees and costs" provided they do not exceed the amounts listed in the agreement.  (ECF No. 32-1 at 18).  While this factor still tends to favor preliminary approval, Plaintiff should provide a more detailed explanation of these attorney's fees provisions.

### 3.    Adequacy of the Relief

The third factor requires the court to consider: "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorneys' fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."  Fed. R. Civ. P. 23(e)(2)(C).  The Court considers these factors in turn.

### a)    *Costs, Risks, and Delay of Trial and Appeal*

In assessing this factor, "courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results."  Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes.  "The amount offered in settlement is generally considered to be the most important consideration of any class settlement."  *Grady v. RCM Techs., Inc.*, 671 F. Supp. 3d 1065, 1075 (C.D. Cal. 2023) (citation omitted).  In determining whether the amount offered in settlement is fair, courts should "compare the settlement amount to the parties' estimates of the maximum amount of damages recoverable in a successful litigation."  *Litty v. Merrill Lynch & Co., Inc.*, No. CV 14-0425 PA (PJWx), 2015 WL 4698475, at *9 (C.D. Cal. Apr. 27, 2015) (internal quotation marks and citation omitted).  However, "a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (citation omitted).  "Even a fractional recovery of the possible maximum recovery amount may be fair and adequate in

light of the uncertainties of trial and difficulties in proving the case." *Millan*, 310 F.R.D.
at 611.

Plaintiff estimates that the maximum potential exposure for the class claims here is
$8,394,455, plus approximately $2,000,000 in PAGA penalties. (Mot. at 25-26, 29). In
making these calculations, Plaintiff assumes that there are 120,000 total workweeks during
the class period and that the average hourly wage of the Class Members is $21.51. (*Id.* at
25-26). On the meal and rest period claims, Plaintiff assumes a single violation per
employee per week, resulting in damages of $2,581,200 for each claim. (*Id.*). On the
unpaid overtime claim, Plaintiff assumes an average of 30 minutes of off-the-clock work,
multiplied by an overtime rate of $32.27, for a total value of $1,936,200. (*Id.*). On the
business expense claim, Plaintiff assumes a rate of $5 of unreimbursed expenses per week,
as well as $180 in unreimbursed expenses for protective equipment per employee, for a
total of $870,000. (*Id.*). On the wage statements claim, Plaintiff assumes there have been
20,000 noncompliant wage statements, multiplied by a $100 penalty,[2] then discounted by
90% to account for the chance of establishing "knowing and intentional" violations
resulting in injuries, resulting in a value of $200,000. (*Id.*). Finally, on the untimely final
wage claim, Plaintiff multiplies the 875 terminated Class Members by the hourly wage, the
number of hours in a shift, and 30 days of penalties, then discounts this figure by 95% to
account for the chance of establishing "willfulness," resulting in a calculated value of
$225,855. (*Id.* at 26).

The Court is concerned with several unexplained assumptions in Plaintiff's
calculations. "[D]amages calculations offered to demonstrate the fairness of a proposed
settlement must be substantiated with detailed, reasoned analysis that explains how the
defendant's maximum potential exposure has been calculated." *Grady*, 671 F. Supp. 3d at
1075. Plaintiff here has not adequately explained "the source of many of the figures or, if

---

[2] The Motion lists a $10 penalty, but the calculation appears to reflect a $100 penalty, in
line with the penalty listed in California Labor Code § 226(e)(1) for each subsequent
violation after the initial pay period.

they are based on assumptions, why those assumptions are reasonable." *Louangamath v. Spectranetics Corp.*, No. 18-cv-03634-JST, 2021 WL 9274552, at *2 (N.D. Cal. May 19, 2021). For example, Plaintiff "conservatively" estimates that employees were deprived of a single rest break and a single meal break each week, justifying one additional hour of pay under Labor Code § 226.7(c), but does not explain why such a "conservative" estimate is reasonable. Plaintiff also assumes an average of thirty minutes of off-the-clock overtime per week, again without explaining the basis. Plaintiff is apparently in possession of Defendants' time records and should therefore either attempt to calculate more accurate figures or explain his inability to do so. *See Millan*, 310 F.R.D. at 612 (rejecting the "assumption that each class member has suffered two hours of overtime underpayment per week" where "Defendant possesses and class counsel has reviewed the time records relating to the underpayment of overtime"). Finally, on the unreimbursed expenses claim, Plaintiff does not explain the basis for estimating reimbursement costs of $5 per week for use of a personal cellphone and $180 per employee for protective equipment.

The Court also has concerns with Plaintiff's calculations of the maximum potential recovery. First, despite the Settlement Agreement settling all of Plaintiff's claims, Plaintiff's calculations omit any reference to the minimum wage and timely wage claims listed in the FAC. In offering a realistic assessment of the maximum potential recovery, Plaintiff cannot omit any of his claims unless those claims are not being settled or have no value in the settlement. Second, Plaintiff applies discount rates of 90 and 95 percent to the wage statement and final pay claims, resulting in much lower estimates. While factors affecting the likely recovery are relevant to the inquiry, insofar as they justify settling for a lower amount, they should not be used in calculating the *maximum potential* exposure. Taking Plaintiff's other figures, the maximum potential exposure here should be $2,000,000 for the wage statements claim and $4,517,100 for the final pay claim. It therefore appears to the Court that the maximum potential recovery is significantly higher than estimated, and that the ratio of the proposed recovery to the maximum potential recovery will be much lower than presented in this Motion.

A lower recovery rate would by no means be fatal to approval of the Settlement Agreement. *See, e.g.*, *Balderas v. Massage Envy Franchising, LLC*, No. 12-cv-06327 NC, 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014) (noting that 8% recovery rate was "especially low," but granting preliminary approval provided plaintiffs explain at final approval why the "recovery is warranted based on the circumstances of this case"); *Millan*, 310 F.R.D. at 612 n.10 (noting that a recovery of "approximately six percent . . . would not be outside the realm of possible approval considering the possible difficulties in Plaintiff's proof of this case"). However, to explain the recovery rate in any renewed motion for preliminary approval, Plaintiff should provide the Court with further explanations of the particular "strengths and weaknesses of the case." *Grady*, 671 F. Supp. 3d at 1076. For example, Plaintiff should explain why a 90 or 95 percent discount rate is warranted for the wage statement and final pay claims with reference to specific difficulties inhibiting those claims. For the other claims, Plaintiff should identify potential defenses and "analyze those issues" or "cite case law and apply it to explain why each claim or defense in the case is more or less likely to prove meritorious." *Eddings v. DS Servs. of Am., Inc.*, No. 15-cv-02576-VC, 2016 WL 3390477, at *1 (N.D. Cal. May 20, 2016).

At the present time, the "information gaps" in Plaintiff's estimated maximum recovery "interfere with the Court's ability to fully assess the settlement." *Loungamath*, 2021 WL 9274552, at *2; *see also Millan*, 310 F.R.D. at 612 ("Without further information regarding violation rates, this Court cannot determine whether the proposed settlement amount fairly compensates the putative class members for their injuries."). "Without a factual and evidentiary foundation how case-specific risk factors warrant the specific reduction from the maximum exposure that has been negotiated as the settlement consideration here, the Court cannot assess the settlement's fairness." *Grady*, 671 F. Supp. 3d at 1076 (internal quotation marks and citation omitted). Based on the information provided, the Court cannot determine whether the settlement amount is adequate or justified by the costs and risks particular to this case. Thus, the Court views this factor as weighing heavily against preliminary approval.

*b)*     *Effectiveness of Proposed Method of Relief Distribution*

The Court next considers the method for processing claims to ensure the proposed method facilitates filing legitimate claims.  The Settlement Agreement provides that, within thirty days of preliminary approval, Defendants will assemble a list of Class Members from their internal records and provide the list to the Settlement Administrator, which will mail a Class Notice to all Class Members via first-class U.S. mail, using the most current, known mailing addresses identified in the list.  (ECF No. 32-1 at 13, 23).  For any returned notices, the Settlement Administrator will send the Class Notice to any listed forwarding address or, if none is listed, conduct a skip trace search to identify the Class Member's current address.  (*Id.*).  Class Members that do not opt out after being mailed a Class Notice will be bound by the terms of the Settlement Agreement.  (*Id.* at 25).  Within 30 days of the effective date of the Settlement Agreement, Defendants will deposit the funds into the settlement fund.  (*Id.* at 18).  Within ten more days, the Settlement Administrator will issue payments to participating Class Members.  (*Id.* at 29).  Individual settlement payments will be calculated and apportioned based on the number of workweeks a Class Member worked during the Class Period.  (*Id.* at 21).  Any funds associated with uncashed settlement checks will be delivered to the California State Controller's Unclaimed Property Fund with an identification of the amount of unclaimed funds attributable to each Class Member.  (*Id.* at 29).

The Court finds this method of distribution to be generally adequate.  However, the Court has concerns with the method of calculating individual settlement payments.  Under the terms of the Settlement Agreement, payments are to be calculated solely based on the number of workweeks worked by each Class Member during the Class Period.  However, the Class includes all overtime-eligible employees and presumably includes employees who were paid at different rates.  "Plaintiff[] make[s] no effort to identify the range of hourly wages paid to employees in the various job positions they seek to represent or explain why a settlement payment based entirely on pay periods worked does not provide preferential treatment to class members who worked on a part-time basis and/or were paid

at a lower hourly rate." *Tijero*, 2013 WL 60464, at *10. Thus, "the Court is not persuaded that the settlement agreement does not provide preferential treatment to certain segments of the class." *Lusby v. Gamestop Inc.*, 297 F.R.D. 400, 414 (N.D. Cal. 2013); *see also Grady*, 671 F. Supp. 3d at 1083 (expressing concern that proposed distribution formula based solely on number of workweeks "fails to account for apparent distinctions amongst the class members based on the class claims" (internal quotation marks and citation omitted)). Accordingly, this factor weighs against preliminary approval. Plaintiff should consider an alternative method of calculating class payments that accounts for differences among the class members. "If a distribution formula that accounts for class member differences would be unworkable or too costly to administer" or is otherwise not warranted under the facts of this case, "then [Plaintiff's] counsel will have to explain to the Court how the simple formula proposed provides equitable compensation in spite of material differences in class members' injuries." *Grady*, 671 F. Supp. 3d at 1083.

### c)    Attorney's Fees

The Court next considers "the terms of any proposed award of attorney's fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). At the preliminary approval stage, "the court should assess the reasonableness of the attorney's fee award because an inordinate fee may be the sign that counsel sold out the class's claims at a low value in return for the high fee." *Lusk v. Five Guys Enters. LLC*, No. 1:17-cv-00762-AWI-EPG, 2019 WL 7048791, at *8 (E.D. Cal. Dec. 23, 2019) (internal quotation marks and citation omitted). In considering the proposed award of attorneys' fees, the Court must scrutinize the Settlement Agreement for "subtle signs" that tend to show collusion: "(1) when counsel receives a disproportionate distribution of the settlement; (2) when the parties negotiate a 'clear sailing arrangement,' under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a 'kicker' or 'reverter' clause that returns unawarded fees to the defendant, rather than the class." *Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (internal quotation marks and alterations omitted).

As discussed above, though the Settlement Agreement has no reverter clause, the Court has concerns both with the proposed amount of attorney's fees and the clear sailing arrangement. The Settlement Agreement provides for attorney's fees up to 1/3 of the total class settlement, in addition to $15,000 in expenses. This is in excess of the 25% "benchmark award for attorney fees" established in this Circuit. *Hanlon*, 150 F.3d at 1029. Nevertheless, "[t]he 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases. Selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). This benchmark can be adjusted depending on "(1) the result obtained; (2) the risk involved in the litigation; (3) the contingent nature of the fee; (4) counsel's efforts, experience, and skill; and (5) awards made in similar cases." *Lusk*, 2019 WL 7048791, at *9. "A court may also cross-check its percentage calculation against the lodestar method to determine the reasonableness of the award." *Id.*

The Court is unable to make a complete determination as to this factor at this stage. Because of the Court's concerns with the estimates of the maximum potential recovery, the Court cannot yet evaluate whether the settlement amount is sufficiently robust to justify an increased award of attorney's fees. And as identified above, Plaintiff has not sufficiently identified the particular risks involved in this litigation that would justify an increased award. While Plaintiff's Counsel appears to have experience and skill in this area, the docket does not reflect any inordinate effort expended on this case and Plaintiff's Counsel has not otherwise discussed such effort in any detail. And while Plaintiff has cited cases in which California state courts have approved similar attorney's fees, he has not compared the facts of this case to those, nor made any argument as to why a heightened award is justified here. Finally, Plaintiff's Counsel has not provided an estimate of the hours worked on this case to enable the Court to cross-check against the lodestar method. In the absence of such information, the Court finds this factor to weigh against preliminary approval.

> d)      *Agreements Required to Be Identified Under Rule 23(e)(3)*

Rule 23(e)(3) requires the parties to "file a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3). Because the parties here filed no such statement, the Court considers this factor to be neutral.

### 4.    Equitable Treatment Among Class Members

Lastly, Rule 23(e) requires examination of whether a proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *Id.*, 2018 Advisory Committee Notes.

As discussed above, the Court is concerned about the calculation method for apportionment of class payments, which fails to account for differences in pay or weekly hours worked. Plaintiff should either alter these calculations to account for these differences among Class Members or explain why such differences do not result in inequity.

Finally, the Court has some concerns about the proposed $5,000 Class Representative Award and the $10,000 General Release Payment. The Ninth Circuit has permitted incentive awards for class representative plaintiffs to compensate for "work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). Whether to grant an incentive award is within the discretion of the district court. *Ochinero v. Ladera Lending, Inc.*, Case No. SACV 19-1136 JVS (ADSx), 2021 WL 4460334, at *9 (C.D. Cal. July 19, 2021) (citing *Rodriguez*, 563 F.3d at 958–59). Though the Ninth Circuit has not set a benchmark, incentive awards in this Circuit typically range from $2,000 to $10,000 with courts treating $5,000 payments as presumptively reasonable. *See, e.g.*, *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D.

438, 470 (C.D. Cal. 2014) (awarding $5,000 incentive awards to the class representatives, noting the awards were "consistent with the amount courts typically award as incentive payments," and citing other case examples within the Circuit); *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) ("Several courts in [the Northern] District have indicated that incentive payments of $10,000 or $25,000 are quite high and/or that, as a general matter, $5,000 is a reasonable amount." (citations omitted)).

While the $5,000 award requested here is not out of the ordinary, Plaintiff has not provided the Court with any information about the time and effort he expended as Class Representative, the reputational risks he faced in bringing these claims, or any other factors that would support the award. Furthermore, while the release signed by Plaintiff is broader than the releases applicable to general Class Members, Plaintiff has not attested that he has any other claims against Defendants that he is foregoing through the waiver. Since "[a] general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release," Cal. Civ. Code § 1542, Plaintiff should be able to identify whether any such claims exist. Absent any such claims, the $10,000 General Release Payment appears more like a supplement to the Class Representative Award than a separate payment in exchange for consideration. Given these concerns, the Court finds that this factor weighs against preliminary approval.

### 5. Weighing the Factors

Weighing the factors discussed above, the Court concludes that it is not "likely" that it would be able to conclude that the Settlement Agreement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(B), 23(e)(2). In particular, the Court is concerned with the following issues: (1) Plaintiff's estimates of the maximum potential recovery include certain unexplained assumptions and fail to include estimates for all of the claims being settled; (2) Plaintiff has inadequately identified the costs, risks, defenses, and delays specific to his claims that would justify a lower settlement-to-potential-recovery ratio; (3) Plaintiff's proposed class payments do not account for differences in pay and hours

worked among Class Members; (4) the proposed attorney's fees exceed the standard Ninth Circuit benchmark and the Settlement Agreement contains a clear sailing provision; and (5) Plaintiff has not adequately explained the basis for awarding both a Class Representative Award and a General Release Payment. Given these concerns, the Court cannot grant preliminary certification of the Settlement Agreement.

### D. PAGA

There are "fundamental differences between PAGA actions and class actions," including that "class certification is not required to pursue a PAGA representative action." *Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (internal quotation marks, citation, and alterations omitted). The plaintiff in a PAGA action acts "as the proxy or agent of the state's labor law enforcement agencies," and any judgment "binds all those who would be bound by an action brought by the government, *including* nonparty employees." *O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citation omitted). "[B]ecause a settlement of PAGA claims compromises a claim that could otherwise be brought by the state, the PAGA provides that 'court[s] shall review and approve any settlement of any civil action filed pursuant to [PAGA].'" *Ramirez v. Benito Valley Farms, LLC*, No. 16-CV-04708-LHK, 2017 WL 3670794, at *2 (N.D. Cal. Aug. 25, 2017) (quoting Cal. Lab. Code § 2699(s)(2)). While the statute does not specify the applicable standard for reviewing PAGA settlements, "a number of district courts have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes." *Haralson*, 383 F. Supp. 3d at 972 (internal quotation marks and citation omitted).

Plaintiff here estimates that the maximum potential liability under PAGA is $2,000,000, based on the statutory $100 penalty for initial violations for approximately 20,000 pay periods within the PAGA period. (Mot. at 29). The Settlement Agreement provides for a PAGA recovery of $100,000, with 75% allocated to the California LWDA and 25% to the PAGA Members based on their share of the total PAGA pay periods. (ECF

No. 32-1 at 20).  This amounts to 5% of the maximum potential PAGA liability and approximately 7.9% of the total proposed settlement.

In the context of joint class and PAGA settlements, both of these ratios are within the range of potential approval.  *See, e.g.*, *Ramirez v. Benito Valley Farms, LLC*, No. 16-CV-04708-LHK, 2017 WL 3670794, at *5 (N.D. Cal. Aug. 25, 2017) (approving PAGA penalty of "4.5% of total estimated possible recovery"); *Kryzhanovskiy v. Amazon.com Servs., Inc.*, No. 2:21-cv-01292-BAM, 2024 WL 4189936, at *16 (E.D. Cal. Sept. 13, 2024) ("The PAGA payment of approximately 3% of the Gross Settlement Fund falls within the range of penalties approved by courts.").  However, "in reviewing a settlement that includes both a Rule 23 class and a PAGA claim, the Court must closely examine *both* aspects of the settlement."  *O'Connor*, 201 F. Supp. 3d at 1134.  As discussed above, the Court is not yet able to determine whether the class settlement is fair, reasonable, and adequate.  Because the adequacy of the PAGA settlement depends in part on that determination, the Court will withhold decision on this question.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion is GRANTED, IN PART, and DENIED, IN PART.

The Court GRANTS Plaintiff's Motion to (1) conditionally certify the class as defined in the Settlement Agreement; (2) appoint Plaintiff Edwin Mejia as Class Representative; and (3) appoint Capstone Law APC as Class Counsel.

The Court DENIES preliminary approval of the Class Action and PAGA Settlement Agreement, without prejudice to refiling.  The Court also DENIES without prejudice Plaintiff's request to schedule a final fairness hearing, appoint a Settlement Administrator, and approve the proposed Class Notice.

Within thirty (30) calendar days from this Order, or by a later date if stipulated by the parties, the parties shall submit a revised motion for preliminary approval that addresses the deficiencies identified in this Order.

**IT IS SO ORDERED.**

DATED:  July 16, 2025

_____
HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE